[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 23, 2010
JOHN LEY
CLERK

No. 09-12725

_____

D.C. Docket No. 06-23048 CV-KMM

ELI LILLY AND COMPANY, individually and
f.u.b.o. Elgo Insurance Company Limited, individually and
f.u.b.o. Certain London Market Reinsurance Underwriters,

Plaintiffs-Appellees,

versus

AIR EXPRESS INTERNATIONAL USA, INC.,
d.b.a. DHL Danzas Air & Ocean,
d.b.a. DHL Global Forwarding,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 23, 2010)

Before MARCUS, WILSON and COX, Circuit Judges.

COX, Circuit Judge:

The Convention for the Unification of Certain Rules for International Carriage ("Montreal Convention") limits international air carrier liability for damage to cargo. This case involves a purported contractual waiver of those limits.

Defendant Air Express International USA, Inc. ("DHL") is a provider of supply chain logistics. Plaintiff Eli Lilly and Company and DHL entered into a long-term service agreement under which DHL agreed to provide logistics services related to the international shipment of Eli Lilly pharmaceuticals. Among other things, DHL arranged for third-party air cargo carriers to transport pharmaceuticals from Europe to the United States. This case arises out of the spoliation of temperature-sensitive insulin products, which were shipped by air from France to Indiana and were exposed to sub-freezing temperatures en route. Pursuant to its service agreement with Eli Lilly, DHL arranged for Lufthansa Cargo AG to transport the insulin. Although the exposure to sub-freezing temperatures was the result of human error attributable to Lufthansa, DHL is liable as a contracting carrier for any damage to the cargo.

Seeking to recover for damage to the insulin products, Eli Lilly and its insurers sued DHL for breach of the long-term service agreement and for breach of two air waybill contracts for carriage of the damaged products. The district court dismissed the claim for breach of the service agreement because it was preempted by the Montreal Convention. In the same order, the court granted Plaintiffs summary

judgment on the issue of liability for breach of the air waybill contracts. And, the court held that, under a provision in the long-term service agreement, DHL waived the liability limitations of the Montreal Convention. DHL appeals; its primary contention is that its liability should be limited pursuant to the Montreal Convention. DHL also argues that Plaintiffs are not entitled to summary judgment because they failed to show that the cargo was damaged in transit and because certain evidence offered to prove its damage is inadmissible. DHL further argues that the court abused its discretion in denying its motion for sanctions for spoliation of evidence. After review, we affirm the grant of summary judgment to Plaintiffs on the issue of liability and the denial of DHL's motion for spoliation sanctions. But we reverse the ruling that DHL stipulated that the air waybill contracts are subject to limits of liability greater than those provided for in the Montreal Convention.

## I. BACKGROUND

### A. The Montreal Convention

We consider in this case certain provisions of the Montreal Convention, a treaty which sets forth uniform rules for international air carriage. We begin with a brief overview of the Convention and its relevant provisions.

International air carrier liability for damage to cargo and injury to passengers has been governed by a set of uniform rules since 1933, when the Warsaw

Convention, adopted by delegates of thirty-three nations in 1929, took effect. The Warsaw Convention created a liability scheme which served as the sole means to remedy injuries suffered in the course of international air transportation of persons, baggage, or goods. *See King v. Am. Airlines, Inc.*, 284 F.3d 352, 356-57 (2d Cir. 2002) (summarizing provisions of the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), *reprinted in* 49 U.S.C. § 40105 note (1997) (hereinafter "Warsaw Convention")). To shield air carriers from catastrophic liability, the Convention set limits on damages, and it restricted the types of claims that could be brought against carriers. *Id.* To protect passengers and shippers, it required carriers to issue air waybills detailing the conditions of carriage, and it created a presumption of liability against carriers for injuries to passengers or damage to cargo. *Id.* Over the years, subsequent international agreements changed its liability scheme, but several features of the Warsaw Convention—caps on damages for injuries suffered in international air transportation, a presumption of liability against carriers, and a requirement that carriers issue air waybills—remain in effect in some form today.

In 1999, fifty-two nations including the United States signed the Montreal Convention, a treaty to replace the Warsaw Convention. Convention for the Unification of Certain Rules for International Carriage by Air, ICAO Doc. 9740,

*reprinted in* Treaty Doc. No. 106-45, 1999 WL 33292734 (2000). The United States Senate ratified the Montreal Convention in September 2003, and it entered into force on November 4, 2003, after at least thirty nations did the same. *Id.* Art. 53

The Montreal Convention provisions related to carrier liability for damage to baggage and cargo are relevant to this case. Article 22(3) of the Convention limits potential liability to seventeen "Special Drawing Rights" ("SDRs") per kilogram of cargo shipped. An SDR is an artificial currency, published daily by the International Monetary Fund, which fluctuates based on the global currency market. *Sompo Japan Ins., Inc. v. Nippon Cargo Airlines Co.*, 522 F.3d 776, 779 n.3 (7th Cir. 2008). These limits may be increased in one of two ways. First, Article 22(3) provides that damages may exceed 17 SDRs per kilogram if "the consignor has made, at the time when the package was handed over to the carrier, a special declaration of interest in delivery at destination and has paid a supplementary sum if the case so requires." This provision did not represent a change in the law; it is nearly identical to Article 22(2) of the original Warsaw Convention. Second, Article 25 of the Montreal Convention, entitled "Stipulation on Limits," states "[a] carrier may stipulate that the contract of carriage shall be subject to higher limits of liability than those provided for in this Convention or to no limits of liability whatsoever." Article 25 is new; there is no parallel provision in the Warsaw Convention or its subsequent

5

amendments. So, the Warsaw Convention as amended expressly provided that limits on liability for damage to cargo could be increased if a shipper declared a value for the cargo and paid a supplementary sum if the case so required; it is unclear whether this was the sole means to increase a carrier's potential liability.[1] After November 2003, when the Montreal Convention entered into force, limits on carrier liability could be increased either by the shipper declaring a value for the cargo or by the carrier stipulating that the contract of carriage, i.e. the air waybill, shall be subject to higher limits of liability. *See St. Paul Ins. Co. v. Venezuelan Int'l Airways, Inc.*, 807 F.2d 1543, 1547 n.6 (11th Cir. 1987) (noting that one of the functions of an air waybill is to serve as the contract of carriage of goods.)

B. Factual Background

Eli Lilly is one of the world's largest pharmaceutical companies. It has manufacturing plants in thirteen countries, conducts clinical research in more than fifty countries, and markets products in 143 countries. Eli Lilly regularly ships

---

[1]The Warsaw Convention permitted a passenger and carrier to agree to a higher limit of liability for death or personal injury "by special contract." Warsaw Convention Art. 22(1). *See generally* Thomas J. Whalen, *Update on the IATA Intercarrier Agreement*, 13 AIR & SPACE LAW 1 (1998) (describing intercarrier agreements invoking Article 22(1) of the Warsaw Convention to increase limits on liability for passenger death or personal injury). This "special contract" provision did not expressly apply to baggage or cargo. But, a special contract to waive limits on liability for damage to or loss of cargo may have been valid under Article 33 of the Warsaw Convention, which provides "[n]othing contained in this convention shall prevent the carrier either from refusing to enter into any contract of transportation or from making regulations which do not conflict with the provisions of this Convention."

products around the world, and due to its complex supply chain, it engages providers of international logistic services who assist Eli Lilly in coordinating shipping, warehousing, and distribution of its products. DHL is the world's largest provider of logistics services. Among other things, it provides international freight forwarding services; it arranges, through various third-party carriers, air and ocean freight services, ground transportation, and warehousing.

DHL and Eli Lilly entered into a long-term service agreement covering a period of five-years beginning on January 1, 2003, eleven months before the Montreal Convention entered into force. The agreement states that DHL will provide Eli Lilly the following services related to the transport of pharmaceuticals to and from Europe and the United States: airfreight, ocean freight, multimodal service, customs clearance and brokerage services, land transportation, warehousing and distribution, project management, and customer service support. (R. 2-93 Ex. C at 4.) It further states that DHL "is to utilize high quality airfreight service providers or if requested, to use a carrier selected by Lilly." (*Id.* at 5.) Article Five of the agreement is entitled "Indemnification." The first paragraph provides that DHL agrees to indemnify Eli Lilly against third-party claims arising from breach of the service agreement. (*Id.* at 10.) The second paragraph contains a limitation of liability stating, in part, that damages that either party is required to pay for whatever reason shall be limited to

two times the amount of the total fees payable to DHL under the service agreement. (*Id.* at 11.) It also states that neither party shall be liable for loss of profits arising out of obligations under the agreement. (*Id.*)

Eli Lilly France, S.A., an Eli Lilly affiliate, manufactures pharmaceuticals at a plant in Fegersheim, France. Eli Lilly France regularly ships pharmaceuticals between Fegersheim and the United States. Lufthansa is Eli Lilly's preferred carrier for these shipments, and Eli Lilly purchased a shipping service from Lufthansa called "Cool/td." Through this service, Lufthansa ships products in insulated containers designed to keep cargo cool during transit. The containers do not protect cargo from freezing temperatures, but Eli Lilly France places temperature recording devices in the containers to monitor the air temperature to which the container and cargo are exposed during transit. Under the Cool/td service, Lufthansa provides trucking from the Fegersheim plant to the airport of departure, airport storage of the containers, loading of the containers onto airplanes, air transport to Chicago O'Hare airport, and trucking service from O'Hare to an Eli Lilly facility in Indiana.

Eli Lilly regularly directed DHL, pursuant to the long-term service agreement, to arrange for Lufthansa to ship containers of pharmaceuticals by air from Fegersheim to the United States. In December 2004, Eli Lilly France requested that DHL arrange a shipment from Fegersheim to Indiana of eight containers of cold-sensitive insulin

and growth hormone utilizing the Cool/td service. The eight containers were divided into two shipments, and DHL arranged for the shipments to depart from Munich, Germany. DHL then issued two "house air waybills," which are contracts of carriage between Eli Lilly and DHL. It also issued two "master air waybills," which are contracts of carriage between DHL and Lufthansa. All waybills contained a box labeled "Declared Value for Carriage." Eli Lilly's practice with respect to the shipments handled by DHL and Lufthansa was never to declare any value for the shipments. Consistent with this practice, the boxes were marked "NVD," or no value declared. The waybills also instructed the carrier to refrigerate the cargo at eight degrees Celsius and to avoid freezing.

The shipments were transported from the Fegersheim plant to the Munich airport in heated trucks hired by Lufthansa. Due to admitted human error by Lufthansa personnel, the containers were left outside in sub-freezing temperatures before they were loaded on to airplanes for shipment to the United States. When the shipments arrived in Indiana, temperature recording devices inside the insulated containers showed that the contents of seven of the eight containers had been subjected to sub-freezing temperatures.

A few days after the shipments arrived in Indiana, Eli Lilly France gave notices of claim to DHL for damage to the cargo, and DHL gave notices of claim to

Lufthansa. A DHL agent then sent an e-mail to Eli Lilly's insurance company representatives requesting that the damaged insulin products not be destroyed. Eli Lilly permitted DHL representatives to examine the insulin products, but did not allow them to be removed from the Eli Lilly facility. Eli Lilly asserts that it destroyed the insulin products shipped in the containers in which temperature recording devices registered below freezing temperatures, but that it salvaged some of the growth hormone. It claims that destroying the insulin was necessary because determining whether it remained viable after being exposed to sub-freezing temperatures would have required that the insulin be subjected to destructive testing. Eli Lilly has not produced records documenting the destruction of the insulin products, and DHL contests whether they were actually destroyed.

Eli Lilly made a claim to its insurer, Elgo Insurance Company, in the amount of $10,251,432.50, which represented the "transfer price" of the insulin products. The transfer price is the price at which an Eli Lilly affiliate in the supply chain that is in possession of a product at a certain point in time sells the product to another Eli Lilly affiliate or a third-party. It encompasses all of the costs incurred throughout the Eli Lilly supply chain and all of the profit that is earned in each step of the supply chain by an Eli Lilly affiliate up to that point in time. The insurer and reinsurers ultimately paid Eli Lilly $9,000,000 to satisfy the claim.

## II. PROCEDURAL HISTORY

Eli Lilly, individually and for the use and benefit of its insurer Elgo Insurance Company Limited, individually and for the use and benefit of Certain London Market Reinsurance Underwriters, filed this action against DHL and Lufthansa in the United States District Court for the Southern District of Florida.[2] The complaint asserts a claim against DHL for breach of the long-term service agreement. It also asserts claims for breach of the air waybill contracts against Lufthansa and DHL. Defendants answered the complaint, and DHL filed a cross-claim against Lufthansa for breach of contract and indemnification or contribution.

All parties moved for summary judgment and moved to strike certain affidavits. Defendants also sought sanctions for spoliation of evidence. The district court issued an omnibus order in which it (1) dismissed the claim for breach of the service agreement because it is preempted by the Montreal Convention, *Eli Lilly & Co. v. Air Express Int'l USA, Inc.*, 602 F. Supp. 2d, 1260, 1268-69 (S.D. Fla. 2009); (2) held that DHL, as a contracting carrier, and Lufthansa, as an actual carrier, are liable under the Montreal Convention for breach of the air waybills, *id.* at 1269-75; (3) held that Lufthansa's liability for the damaged cargo is capped at seventeen SDRs per kilogram

---

[2]The Complaint also named as defendants Danzas Corporation, Deutsche Post World Net, and DHL Express (USA), Inc. These defendants were dismissed without prejudice at an early stage in the litigation.

11

pursuant to Article 22(3) of the Montreal Convention, *id.* at 1275; (4) held that DHL's liability is not limited by the Montreal Convention and is instead governed by the terms of the liability provision contained in the long-term service agreement, *id.* at 1276-78; (5) held that damages are to be calculated based on the transfer price of the damaged cargo, *id.* at 1278-79; (6) held that Eli Lilly did not commit spoliation of evidence, *id.* at 1279-80; and (7) denied all motions to strike, *id.* at 1280-81. Thereafter, Plaintiffs settled all claims against Lufthansa and all parties stipulated to Lufthansa's dismissal from the case. (R.5-258.) In addition, Plaintiffs and DHL stipulated, without waiving DHL's rights to contest certain rulings contained in the omnibus order, that judgment may be entered against DHL and in favor of Plaintiffs for the sum of $10,216,958.12. (R.5-259.) The court then entered a final judgment in favor of Plaintiffs against DHL (R.5-260) and dismissed all claims against Lufthansa with prejudice. DHL appeals, challenging: (1) the grant of summary judgment in favor of Plaintiffs on the issue of liability and the denial of its motion for summary judgment on that issue; (2) the ruling that DHL's liability is governed by the liability provision in the long-term service agreement; and (3) the denial of its motion for sanctions for spoliation of evidence.

## III. ISSUES ON APPEAL AND CONTENTIONS OF THE PARTIES

The main issue on appeal is whether DHL's liability should be limited to seventeen SDRs per kilogram of the damaged cargo pursuant to Article 22(3) of the Montreal Convention, or whether the long-term service agreement between DHL and Eli Lilly constitutes a stipulation to waive those limits. DHL argues: (1) because the court dismissed Plaintiffs' claim for breach of the service agreement as preempted by the Montreal Convention, it erred in applying the terms of that agreement to Plaintiffs' remaining claims for breach of the air waybill contracts; (2) the court improperly incorporated the terms of the service agreement into the separate air waybill contracts because the air waybill contracts were marked "no value declared"; (3) DHL did not breach the service agreement, and the liability limitation contained therein applies only if Eli Lilly sought indemnity from third-party claims arising from breach of the agreement; and (4) the liability limitation in the service agreement is ambiguous, and the court erred in interpreting that provision in favor of the drafter, Eli Lilly. Plaintiffs counter that: (1) the service agreement provides that all air waybill contracts between the parties would be subject to limits of liability in excess of 17 SDRs per kilogram; (2) the Montreal Convention permits parties to enter into an agreement collateral to the air waybill contracts waiving the Convention's limits; (3) there was no reason for Eli Lilly to declare a value on the air waybills because

13

under the service agreement the parties opted out of the Montreal Convention liability regime; (4) the liability provision applied not only to indemnity claims but to all claims arising from the agreement; and (5) it was not ambiguous.[3]

DHL also contends that in concluding that the pharmaceuticals were damaged, the court erred in considering an affidavit of Rene Scheer, an Eli Lilly logistics manager. It argues that the contents of the affidavit were not based on Scheer's personal knowledge, that they were hearsay, that attached documents were not authenticated, and that the documents were translated from French to English by Scheer himself, who is not a certified translator. Plaintiffs counter that the district court did not rely on the challenged portions of the affidavit, that the contents of the affidavit were drawn from Scheer's personal knowledge gained from his job duties as a logistics manager, that the translations comport with the Federal Rules of

---

[3]DHL also contends that even if the court did not err in holding that the Montreal Convention limits were waived by the long-term service agreement, it erred in calculating damages based upon the transfer price of the damaged insulin products as opposed to the cost of replacement. It argues that the transfer price includes lost profits, which the liability provision precludes Eli Lilly from recovering. Plaintiffs counter that the transfer price represents the real value of the cargo; while it includes profits lost by Eli Lilly affiliates, it does not include any of the profits to which Eli Lilly itself would have been entitled in a sale of the pharmaceuticals to third parties. Because we conclude that the Montreal Convention limits DHL's liability to seventeen SDRs per kilogram, we do not address whether the court erred in calculating damages based upon the transfer price of the damaged insulin.

14

Evidence, and that the attached documents fall under the business records exception to the hearsay rule.

DHL further contends that summary judgment was inappropriately granted on the issue of whether the pharmaceuticals were damaged in transit. It points out that Plaintiffs did not present proof that the pharmaceuticals were in fact destroyed, and it claims that Eli Lilly refused to produce the pharmaceuticals for testing and inspection by DHL. Plaintiffs counter that they presented evidence that the insulin products were subjected to sub-freezing temperatures during transit, and this exposure rendered them worthless whether or not actual damage occurred.

Finally, DHL contends that the court abused its discretion in holding that Eli Lilly did not commit spoliation of evidence by refusing to permit testing and inspection of the pharmaceuticals. Plaintiffs counter that a party moving for sanctions for spoliation of evidence must prove prejudice. And, federal regulations mandate destruction of pharmaceutical products subjected to sub-freezing temperatures whether or not they are in fact damaged. Given that the pharmaceuticals were worthless regardless of their condition, Plaintiffs argue that DHL did not suffer prejudice from not having the opportunity to inspect the pharmaceuticals before they were destroyed.

## IV. STANDARD OF REVIEW

We consider de novo a grant or denial of summary judgment, applying the same legal standards as the district court. *Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1337 (11th Cir. 2008).

A district court's evidentiary rulings are reviewed for abuse of discretion. *General Elec. Co. v. Joiner*, 522 U.S. 136, 141, 118 S. Ct. 512, 517 (1997).

A district court's decision regarding spoliation sanctions is reviewed for abuse of discretion. *Harris v. Chapman*, 97 F.3d 499, 506 (11th Cir. 1996).

## V. DISCUSSION

A. *The Montreal Convention limits DHL's liability to 17 SDRs per kilogram of the damaged pharmaceuticals.*

The Montreal Convention limits on liability may be waived under Article 22(3) if the shipper declares a value for the cargo or under Article 25 if the carrier stipulates that the contract of carriage shall be subject to higher limits of liability. It is undisputed that Eli Lilly did not declare a value for the cargo. At issue is whether a provision in the long-term service agreement constitutes a stipulation to waive the Montreal Convention limits.

The district court dismissed Plaintiffs' claim for breach of the long-term service agreement because it was preempted by the Montreal Convention, and this ruling is

not contested on appeal.[4] Plaintiffs' remaining claims allege breach of the air waybill contracts. The court noted that "[t]he parties did not stipulate in any of the air waybills that the shipments in question would be subject to higher limits of liability than those provided for in the Montreal Convention." *Eli Lilly*, 602 F. Supp. 2d at 1276. Nevertheless, it held that DHL stipulated to waive the Convention's limits through the liability provision in the long-term service agreement. *Id.* The court explained that "the Liability Limitation clearly and unambiguously establishes that DHL's liability is limited to two times the total fees payable to DHL for the duration of the Service Agreement." *Id.* The air waybills and the service agreement are separate contracts, and they were not executed contemporaneously. Therefore, in concluding that a provision in the service agreement serves as a stipulation to subject the waybills to increased limits on liability, the court implicitly held that the service agreement is incorporated into the air waybill contracts.

In addressing whether the liability provision of the service agreement constitutes a stipulation to waive the Montreal Convention limits, we first interpret the terms of the service agreement and the air waybill contracts; we must discern the

---

[4]Article 29 of the Convention preempts state law actions falling within its scope. It reads, in part, "[i]n the carriage of passengers, baggage and cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention . . . ." *See Paradis v. Ghana Airways Ltd.*, 348 F. Supp. 2d 106, 111 (S.D.N.Y. 2004).

meaning of the liability provision and discern whether the parties intended to incorporate that provision into the air waybill contracts. We generally apply state law to such questions of contract interpretation, and the parties assume that Florida law controls.[5] *See e.g. In re Chira*, 567 F.3d 1307, 1311 (11th Cir. 2009) ("The interpretation of private contracts is ordinarily a question of state law.") (quotations and citations omitted). If we conclude that the parties did intend for the liability provision to serve as such a stipulation, we would have to consider whether that stipulation is effective. We would examine Article 25 of the Montreal Convention to determine what a carrier must do to effectively stipulate that a contract of carriage shall be subject to limits of liability in excess of seventeen SDRs per kilogram. Because this involves interpretation of an international treaty, it is a question of federal law. *See Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256, 1258 (9th Cir. 1977) ("The scope of the Warsaw Convention is a matter of federal law and federal treaty interpretation, and must be determined from an examination of the 'four corners of the treaty.'") (citations omitted).

---

[5]Neither the service agreement nor the air waybill contracts contain a choice of law provision. Eli Lilly is an Indiana corporation, and DHL is a foreign corporation, but its headquarters is in Florida. The incidents giving rise to this dispute occurred in France, Germany, and Indiana. It is unclear what law governs the interpretation of the service agreement and the air waybill contracts. We need not dwell on choice of law issues, however, because we apply general rules of contract interpretation to discern the meaning of the contracts. We would reach the same conclusions as to these issues regardless of what law we applied.

Before turning to whether the parties intended to incorporate the liability provision of the service agreement into the air waybill contracts, we pause to note that it is an open question whether Article 25 of the Montreal Convention permits parties to agree to waive the Convention's limits in a document separate from the air waybills. DHL contends that a stipulation under Article 25 is valid only if contained in the contract of carriage, i.e. the air waybill, itself. We are aware of no authority supporting this position. And, Article 25 does not state that the stipulation must be "in" the contract of carriage. Further, Article 27 provides that "[n]othing contained in this Convention shall prevent the carrier . . . from waiving any defences available under the Convention, or from laying down conditions which do not conflict with the provisions of this Convention." So, it appears from the language of the Montreal Convention that a stipulation to increase a carrier's potential liability may be valid even if it is not set forth in the waybill itself. Nevertheless, we need not decide this issue. We assume that a carrier may stipulate to waive the Convention's limits in a document separate from the air waybill. But, we conclude that the parties did not intend for the liability provision in Article 5 of the long-term service agreement to be such a stipulation.

19

The first paragraph of Article 5 is a third-party indemnity provision. It reads:

Article 5: Indemnification

Except for claims for personal injury or property damage which are caused by the failure of Lilly to observe any of the terms and conditions of this agreement and those claims for personal injury or property damage which arise from the gross negligence or willful misconduct of Lilly, Supplier hereby agrees to indemnify and hold Lilly harmless against and from any and all claims arising from any breach or default in the performance of any obligation on Supplier's part to be performed under the terms of the agreement, or arising from any act, neglect, fault, or omission of Supplier or of its agents, employees, visitors, invitees, or licensee and from and against all costs, attorney's fees, expenses, and liabilities incurred in or about any such claims or any action against customer by reason of such claim. Supplier, upon notice of Lilly, shall defend same at Supplier's expense.

(R.2-93 Ex. C. at 10.) This provision appears to require DHL to indemnify Eli Lilly from third-party claims that arise from DHL's breach of the service agreement. The second paragraph of Article 5 is entitled "Liability Limitations." It reads:

Except for a party's obligations of this Agreement, any damages that either party is required to pay for any reason whatsoever and regardless of the form of action, in the aggregate, shall be limited to two times the amount of the total fees payable to Supplier hereunder. Neither Supplier nor Lilly shall be liable for any special, punitive or consequential damages, or loss of profits arising out of or in connection with their respective obligations under this Agreement. Notwithstanding the foregoing, if any claim against Supplier is a claim covered by any insurance policy maintained by Supplier, any recovery of proceeds under such policy shall be paid to Lilly to the extent Lilly's damages exceed the foregoing limitation of liability.

20

(*Id.* at 11.) This provision appears to cap either party's potential liability to two times the amount of the total fees payable to DHL under the agreement. Because the liability provision is contained in a section of the agreement addressing indemnification, the parties dispute whether it applies only where Eli Lilly seeks indemnification from third party claims arising from DHL's breach of the service agreement, or whether it applies to any and all claims arising from the service agreement. We need not resolve this dispute. Whatever the scope of the liability provision, we have no reason to conclude that the parties intended for it to apply to the separate air waybill contracts so as to subject those contracts to limits of liability in excess of those imposed by law.

The service agreement took effect January 1, 2003, eleven months before the Montreal Convention entered into force. The governing law in January 2003 (the Warsaw Convention as amended by subsequent international agreements) did not include a provision parallel to Article 25 of the Montreal Convention—one providing that a carrier may stipulate that a contract of carriage would be subject to increased limits on liability. Had the parties intended for the service agreement to constitute a stipulation to waive limits on liability, this would not have been expressly permitted

21

by the Warsaw Convention, and may have been invalid.[6] This suggests that the parties did not intend such a result. In addition, the service agreement makes no mention of the Montreal Convention, the Warsaw Convention, the concept of declared value, or limits of liability imposed by law. Nor does it contemplate that the service agreement would modify any subsequently executed air waybill contracts. In sum, there is no indication that the parties intended to opt out of the Montreal Convention liability regime through Article 5 of the service agreement.

The air waybill contracts at issue were executed after the Montreal Convention took effect. The parties knew of the limits on air carrier liability and the ways to contract around those limits—declaring a value for the cargo or stipulating to waive the limits. The waybills show that the parties declined to do so. They note that potential liability is limited to seventeen SDRs per kilogram of cargo[7] and state, "[t]he shipper's attention is drawn to the notice concerning carrier's limitation of liability. Shipper may increase such limitation of liability by declaring a higher value for carriage and paying a supplemental charge if required." (R.1-1 Ex's A-D.)

---

[6]*But see supra* note 1 (suggesting that a stipulation to waive the Warsaw Convention limits on liability may have been valid under Article 33 of that convention).

[7]The notices of limited liability are printed on the reverse side of the air waybills. The reproductions of these documents contained in the record are illegible. (R.5-217 Ex. A at 2.) Both parties acknowledge, however, that the air waybill contracts contain a clause limiting liability to seventeen SDRs per kilogram. (Appellee's Br. at 35; Appellant's Br. at 24.)

22

Furthermore, the air waybill contracts indicate no intent to incorporate the service agreement's liability provision. "Where a written contract refers to and sufficiently describes another document, that other document or so much of it as is referred to, may be regarded as part of the contract and therefore is properly considered in its interpretation." *See e.g. Hurwitz v. C.G.J. Corp.*, 168 So. 2d 84, 86 (Fla. 3d DCA 1964) (internal quotation and citation omitted). There is no mention of the service agreement in the air waybill contracts. Had the parties agreed to incorporate the service agreement's liability provision so as to waive the Convention's limits, they could have noted their intent to do so. But they did not.

The conduct of and course of dealings between the parties supports our conclusion. Eli Lilly purchased insurance to fully cover the value of the cargo in the event of its damage or loss in transit (R.5-218 at 89). This suggests that Eli Lilly declined to opt out of the Montreal Convention liability regime. *See Groupe Chegaray/V. De Chalus v. P&O Containers*, 251 F.3d 1359, 1363 (11th Cir. 2001) (noting that shippers, instead of paying increased freight by declaring the value of what is shipped, generally buy insurance from cargo insurers). And, in 2002, before the service agreement took effect, DHL arranged for air cargo transport of a number of shipments of Eli Lilly pharmaceuticals. *Eli Lilly*, 602 F. Supp. 2d at 1265 ("Since at least 2002, Lilly France instructed DHL to arrange bookings with Lufthansa for six

23

to eight containers to be shipped per week.") Eli Lilly declined to declare a value for these shipments. (R.5-218 at 68) (acknowledging that Eli Lilly never declared a value for cargo). After the service agreement became effective, DHL arranged for additional shipments, including the two that gave rise to this case. Eli Lilly declined to declare a value for these shipments as well. This suggests that the parties did not intend for the long-term service agreement to have any effect on DHL's potential liability under the air waybills; it shows that, before and after the agreement commenced, they intended for all air waybill contracts to be subject to limits of liability imposed by the Warsaw or Montreal Conventions.

The long-term service agreement makes no mention of the Montreal Convention, its predecessor the Warsaw Convention, or to limits on air carrier liability imposed by law. Nor does the face of the air waybill contracts show that the parties intended to incorporate the terms of the service agreement into those contracts. And, the conduct and course of dealings between the parties does not suggest otherwise. For these reasons, we conclude that the parties did not *intend* for the liability provision of the long-term service agreement to subject the air waybill contracts to increased limits of liability. We need not reach the question whether that provision constitutes an *effective* stipulation under Article 25 of the Montreal Convention. Our conclusion is drawn solely from our interpretation of the contracts,

24

not by considering whether Article 25 of the Convention would have permitted the purported stipulation.

B. *The district court did not abuse its discretion in considering certain affidavits and deposition testimony.*

DHL argues that the court erred in considering an affidavit of Rene Scheer, logistics manager of Eli Lilly France, in determining whether the cargo was delivered to DHL and Lufthansa in good condition.[8] According to DHL, the affidavit is not based on Scheer's personal knowledge, is hearsay, attached documents were not authenticated, and those documents were not translated from French to English by a certified translator. These arguments are without merit. The court "only relied on that portion of Scheer's affidavit that sets forth and attaches the business records relating to the shipments in question: i.e., packing lists for the subject cargo generated by Lilly France, protocols of manufacture, analysis, and release; certificates of analysis; and checklists for the containers." *Eli Lilly*, 602 F. Supp. 2d at 1280. We find no error in the district court's analysis in its omnibus order concluding that Scheer is qualified to testify concerning the documents at issue, that those documents fall within the business records exception to the hearsay rule, Fed. R. Evid. 803(6),

---

[8]DHL also argues that the court erred in considering deposition testimony of Michael Mabe and William C. Harris to conclude that the pharmaceuticals were damaged in transit. Upon review of the record, we conclude that these arguments are without merit.

and that Scheer's translations of the documents from French to English could be considered. (*Id.* at 1280-81.)

C. *Summary judgment was appropriately granted on the issue of whether the cargo was damaged in transit, and Plaintiffs did not commit spoliation of evidence.*

DHL argues that because Plaintiffs failed to produce documents showing that the pharmaceuticals had been destroyed, they failed to present evidence sufficient to show that they were damaged in transit. DHL further argues that because Plaintiffs denied DHL an opportunity to inspect and test the pharmaceuticals, they committed spoliation of evidence warranting an adverse inference on this issue. But, Plaintiffs produced records showing that the insulin was subjected to sub-freezing temperatures and evidence showing that the devices which measured the temperatures were tested and certified for accuracy before and after use. Further, federal regulations provide that pharmaceuticals subjected to sub-freezing temperatures must be tested for safety and purity prior to being salvaged. 21 C.F.R. § 211.208. And, Plaintiffs presented uncontradicted expert testimony that any testing of insulin subjected to sub-freezing temperatures would result in destruction of the insulin. Because Plaintiffs presented undisputed evidence that the insulin was subjected to sub-freezing temperatures and undisputed evidence that the insulin is unsaleable regardless whether actual damage

26

occurred, Plaintiffs are entitled to summary judgment on the issue of whether the insulin products were damaged in transit.

As to DHL's spoliation claim, a party moving for sanctions must establish, among other things, that the destroyed evidence was relevant to a claim or defense such that the destruction of that evidence resulted in prejudice. *See Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 943 (11th Cir. 2005) (explaining that spoliation analysis hinges upon the significance of the evidence and the prejudice suffered as a result of its destruction.) The destruction of the insulin products did not affect DHL's ability to make a claim or defense; the exposure to sub-freezing temperatures rendered the products worthless regardless of the results of any tests that DHL may have conducted. Because DHL suffered no prejudice, the district court did not abuse its discretion in denying its claim for spoliation of evidence.

## VI. CONCLUSION

For the reasons stated in this opinion, we affirm the grant of summary judgment in favor of Plaintiffs on the issue of liability, affirm the denial of DHL's motion for summary judgment, and affirm the denial of DHL's motion for sanctions for spoliation of evidence. We reverse the ruling that DHL's liability shall be governed by the terms of the long-term service agreement and therefore vacate the final judgment entered by the district court. We remand to the district court for

proceedings not inconsistent with this opinion and with instructions that DHL's liability shall be capped at 17 SDRs per kilogram of the damaged cargo pursuant to Article 22 of the Montreal Convention.

AFFIRMED IN PART; REVERSED IN PART; JUDGMENT VACATED; AND REMANDED WITH INSTRUCTIONS.