[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14450
Non-Argument Calendar
_____

D.C. Docket No. 4:12-cv-00127-WTM-GRS


JOHN HORTON, et al.,

Plaintiff-Appellant,

versus

MAERSK LINE, LIMITED, et al.,

Defendants-Appellees.


_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(February 27, 2015)

Before HULL, ROSENBAUM, and JULIE CARNES, Circuit Judges.

PER CURIAM:

The plaintiff in this case, a longshoreman, suffered serious injuries when a twist-lock fell onto his neck.  He sued the owner of the ship on which he was working and the owner of the containers being loaded onto the ship.

He now appeals two orders from the district court granting summary judgment to these two defendants.

## I.    BACKGROUND

On the morning of March 18, 2011, plaintiff-appellant John Horton ("Plaintiff"), a longshoreman, was working aboard the *M/V Sealand Champion* when a crane operator, placing a shipping container onto a stack of other shipping containers, used sufficient force to dislodge a twist-lock from one of the containers.[1]  The twist-lock fell and struck Plaintiff on the head.  Although he was wearing a hardhat, Plaintiff's neck was broken in two places.  After Plaintiff was taken to the hospital, the twist-lock was taken from the ship's deck and brought to the ship's office.  It was given to the ship's captain, who examined it and found it to be in working order.  The twist-lock was tagged to identify it and retained by the owner of the ship.

---

[1]  A twist-lock is "a locking device for securing large containers to the trailers on which they are transported." *Twist-lock Definition*, OED.COM, http://www.oed.com/view/Entry/208149?redirectedFrom=twist+lock#eid17272399 (last visited Jan. 21, 2015).

Plaintiff filed suit against the Georgia Ports Authority, the employer of the crane operator, in the State Court of Chatham County, Georgia. Plaintiff alleged that it was the negligent stacking of the containers that had caused his injuries. That case was settled, with Plaintiff receiving $600,000 from the Authority. Plaintiff then filed suit, also in the State Court of Chatham County, against defendant-appellee Maersk Line, Limited ("Maersk"), the owner of the *M/V Sealand Champion*. Maersk removed this legal action to the Southern District of Georgia. Plaintiff subsequently added, as a party, defendant-appellee A.P. Moller-Maersk, A/S ("Moller"), the owner of the shipping container. In Plaintiff's amended complaint, he alleged that Maersk failed "to exercise reasonable care to provide vessel equipment which was reasonably fit for its intended use." The equipment was unfit because "[t]he locking shoes/twists locks were antiquaiated [sic] and were known by Defendant MAERSK LINE, LIMITED to release from containers when being placed on vessels." As for Moller, Plaintiff argued that it "was in charge and had substantial control over the container at issue and breached its duty to Plaintiff and other longshoreman [sic] by failing to maintain the container and ensure that it was reasonably fit for its intended use." As to these defendants, Plaintiff asserted claims of negligent maintenance, negligent employment, negligent training, and negligent failure to warn.

3

Plaintiff sought to support his theory that the twist-lock was defective through the expert testimony of Robert Williams and Jeffery Culwell. Williams stated that he has "[a]pproximately twenty-eight years of welding experience in MIG (metal inert gas), TIG (tungsten inert gas), arc welding and stick (shield metal arc) welding." Plaintiff argued that Williams' welding experience, which includes seventeen years of repairing shipping containers, qualified him as an expert to testify on any defects in the casting corner or twist-lock.[2] Williams' inspection of the casting corner on the container involved in the accident led him to the opinion that it had been "shaved," was rusted, and was generally worn. This condition made it more likely, in Williams' opinion, that a twist-lock would fail. Culwell has thirty-four years of engineering experience, including consulting on maritime equipment, and specifically on twist-lock issues. Culwell also opined that the corner casting was worn and perhaps corroded, which could "adversely affect the proper engagement [of the twist-lock] into the corner casting."

Moller, the owner of the shipping container, moved to exclude the testimony of Williams and Culwell. Moller contended that Williams was unqualified as an expert and that his opinion was unreliable. Moller contended that Culwell had also reached an unreliable opinion. Plaintiff disputed these arguments. Moller also

---

[2] The docket and briefs occasionally refer to the "casing corner," although "casting corner" seems to be the appropriate term. In any event, the phrase refers to the part of the container into which the twist-lock fits.

4

moved for summary judgment, arguing that without the testimony of Williams and Culwell, Plaintiff had provided no evidence of a defect in the container that had caused the accident, and thus there was no genuine dispute of material fact. Plaintiff argued that, because the expert testimony should not be excluded, there was a genuine dispute of material fact.

The district court granted Moller's motion to exclude the expert testimony of Williams and Culwell. As for Williams, the district court determined that Plaintiff had "not established that Mr. Williams's experience as a welder and container repairman qualifies him as an expert on the interaction between twist-locks and corner casings." Rather, "[a]t most, Mr. Williams's experience may qualify him to assess the quality of container repair. However, that experience repairing containers is simply tangential to the issue of whether there was a defect in the corner casting and whether that defect caused the twist-lock to separate from the container." The district court further noted that "the expert report only states that Mr. Williams has twenty-eight years of experience working as a welder, with twenty-one of those in container repair; holds no professional memberships; has not published any literature; and has never testified as an expert."

As for Culwell, the district court determined that his opinion was unreliable because, in his expert report, his "methodology is not even explained, precluding

5

any ability to determine its reliability"; his analysis was not "based on any technique that has been subjected to peer review"; and "no standards for determining inappropriate amounts of wear for corner casings" were offered. The district court found that "Culwell did little more than look at pictures of the container and arrive at a personal belief that the corner casting may have contributed to the twist-lock becoming dislodged." This lacked "the slightest iota of science."

Addressing Moller's motion for summary judgment, the district court noted that, because Plaintiff had failed to provide any ground beyond the testimony of Williams and Culwell for the existence of a genuine issue of material fact, the motion must be granted.

Maersk, the owner of the ship, also moved for summary judgment, arguing that its duties to Plaintiff were quite narrow once the stevedore had commenced the loading and unloading of the ship.[3] In response, Plaintiff argued that Maersk had a duty to supervise the cargo operations and was negligent in that duty. Plaintiff also argued that he should be entitled to an adverse inference that Maersk failed to turn over a reasonably safe vessel to the stevedore. This adverse inference arises from

---

[3] A stevedore is a "person or company that hires longshore and harbor workers to load and unload ships." *Black's Law Dictionary* 1549 (9th ed. 2009).

6

the fact, according to Plaintiff, that the actual twist-lock involved in the accident was not identified.

Maersk's motion for summary judgment was also granted.  Plaintiff's case against Maersk was premised on the breach of duties allegedly owed by a ship owner to longshoremen:  (1) the duty to turn over to the stevedore and longshoremen a reasonably safe vessel and (2) the duty to properly supervise cargo operations.  As for the first duty, the district court decided that Plaintiff was "unable to point to any evidence that Defendant Maersk failed to properly turn over the vessel to the stevedore."[4]  As for the second duty, the district court held that Maersk, as ship owner, had no duty to supervise the cargo operations conducted by the stevedore, but was expected only to warn the stevedore of dangers that were known or should have been known.  As there was no evidence of a defect in the twist-lock, there was also no reason that Maersk failed to exercise reasonable care in discovering such a defect.

## II.    ARGUMENTS ON APPEAL

On appeal, Plaintiff argues that the district court erred in granting summary judgment to Maersk because the district court (1) misconstrued the duty Maersk

---

[4]  The district court also rejected Plaintiff's request for an adverse inference from the alleged fact that the twist-lock that was produced in discovery had either been modified or was not the actual-twist lock that had been involved in the accident.  The basis for this request, as the district court noted, was "simply because the twist-lock provided by Defendant Maersk did not meet [Plaintiff's] expectations."

owed to Plaintiff and (2) should have granted an adverse inference that the twist-lock was defective.  Plaintiff argues that the district court erred in granting summary judgment to Moller because it should not have excluded Williams and Culwell as experts and, had their testimony been admitted, a genuine issue of material fact would have existed.   We address these contentions in turn.

## A.    Maersk's Duties to Plaintiff

We review a grant of summary judgment *de novo*, applying the same legal standard as the district court.  *Connelly v. Metro. Atlanta Rapid Transit Auth.*, 764 F.3d 1358, 1363 (11th Cir. 2014).  Further, "[w]e review questions of law *de novo*[.]"  *Dixon v. U.S Att'y Gen.*, 768 F.3d 1339, 1341 (11th Cir. 2014).

Plaintiff contends that the district court mischaracterized Maersk's duties as ship owner to Plaintiff as a longshoreman.  Specifically, Plaintiff argues that the International Safety Management Code ("the Code") mandates that a Safety Management System Manual be kept onboard the vessel for the crew's use.  This manual, Plaintiff states, requires the ship's officers to supervise and ensure safe cargo loading.  Plaintiff points to deposition testimony from the chief officer and captain of the *M/V Sealand Champion* that confirms that the ship had this responsibility.  On this basis, Plaintiff argues that Maersk had a duty to supervise

8

the cargo operations and that there is "a clear question of fact as to whether . . . [Plaintiff's] injuries were proximately caused by Maersk's failure to supervise."

In its response, Maersk argues that the district court correctly stated the applicable law and that Plaintiff's argument about the Code is unavailing because it imposes no duties on the ship owner that would supersede the existing legal obligations.  As a longshoreman alleging negligence against a ship owner, Plaintiff's claim is governed by § 905(b) of the Longshore and Harbor Workers' Compensation Act ("the Act"), 33 U.S.C. §§ 901–950.  As the Supreme Court and this Circuit have explained, the Act imposes limited duties on a ship owner.  First, "a shipowner must turn over the ship and its equipment in a condition that permits a stevedore to do its work with reasonable safety, and must warn the stevedore of any hidden dangers of which it knows or should know." *Roach v. M/V Aqua Grace*, 857 F.2d 1575, 1581 (11th Cir. 1988) (citing *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 166–67 (1981)).  Second, "the shipowner may rely on the stevedore to perform its work with reasonable care, and there is no duty to supervise the stevedore 'absent contract provisions, positive law, or custom to the contrary.'" *Id.* (quoting *Scindia*, 451 U.S. at 172).  Third, "[t]he shipowner must intervene only when it becomes aware that the ship, its equipment or gear poses a danger to the stevedore *and* is also aware that the stevedore is acting unreasonably

9

to protect the longshoreman." *Id.* (citing *Scindia*, 451 U.S. at 178) (emphasis in original).  This duty is limited, however, because "creation of a shipowner's duty to oversee the stevedore's activity and insure the safety of longshoremen would . . . saddle the shipowner with precisely the sort of nondelegable duty that Congress sought to eliminate by amending section 905(b)." *Scindia*, 451 U.S. at 169 (internal quotations omitted) (quoting *Hurst v. Triad Shipping Co.*, 554 F.2d 1237, 1249 n.35 (3d Cir. 1977)).

It is clear that under the Act, there is no duty of the ship owner to supervise the stevedore.  The question is whether the Code imposes such a duty.  The Code, which is part of the International Convention for the Safety of Life at Sea, has been implemented by Congress in 46 U.S.C. §§ 3201–3205.  The safety management system Plaintiff mentions is to be implemented through regulations.  46 U.S.C. § 3203(a).  These regulations are contained in 33 C.F.R. §§ 96.200–96.390.  A vessel subject to the regulations may face a civil penalty or a revocation of its Coast Guard clearance if it is not in compliance with the regulations.  33 C.F.R. § 96.380(c).

The circuit courts have not opined on whether the Code creates additional duties, running from vessels to longshoremen, besides those set out in the Act. District courts within this Circuit have done so, however, and have come to the

conclusion that it does not. *E.g., Aronson v. Celebrity Cruises, Inc.*, No. 12-CV-20129, 2014 WL 3408582, at *11 (S.D. Fla. May 9, 2014) ("[T]he International Safety Management Code does not create any duties and thus cannot be the basis for a negligence claim against a cruise line."); *Rinker v. Carnival Corp.*, 753 F. Supp. 2d 1237, 1243 (S.D. Fla. 2010) ("Plaintiff has failed to present any authority that establishes that the [Code] creates any duties that Carnival owes to Plaintiff."); *Calderon v. Offen*, No. 07-61022-CIV, 2009 WL 3429771, at *4 (S.D. Fla. Oct. 20, 2009) ("Congress merely desired to participate with other maritime nations in achieving safety goals [through the Code], but did not intend to change long-established rules of law which govern liability and its allocation in general maritime law.")  Addressing the regulations implemented in furtherance of the Code, the Southern District of New York noted that 33 C.F.R. § 96.230 was "cast in general terms which restate principles already well established by American case law," and thus should not be construed as imposing additional duties. *Johnson v. Horizon Lines, LLC*, 520 F. Supp. 2d 524, 533 (S.D.N.Y. 2007).

We agree with these district courts that Plaintiff cannot rely on the Code to support his negligence claim against Maersk.  Plaintiff points to no authority that recognizes the Code as modifying the duties set out in the Act and recognized in *Scindia*.  Congress has directed that compliance with the Code is to be achieved

11

through regulations that are "consistent" with it, and it has provided penalties for non-compliance. 46 U.S.C. § 3203(b); 33 C.F.R. § 96.380(c). Further, attributing to the ship owner a duty to supervise cargo loading and unloading would run directly contrary to the Supreme Court's interpretation of the Act: namely, that a duty to supervise the stevedore would "saddle the shipowner with precisely the sort of nondelegable duty that Congress sought to eliminate[.]" *Scindia*, 451 U.S. at 169. Because Plaintiff has not cited any specific United States statute or regulation that provides a private right of action for the breach of the duty he alleges, nor any judicial precedent that recognizes the Code as a basis for a negligence claim, we reject Plaintiff's argument on this point and hold that the district court identified and applied the correct legal standards: namely, those recognized in the Act.

## B.    The Adverse Inference

"A district court's decision regarding spoliation sanctions is reviewed for abuse of discretion." *S.E.C. v. Goble*, 682 F.3d 934, 947 (11th Cir. 2012) (quoting *Eli Lilly & Co. v. Air Express Int'l USA, Inc.*, 615 F.3d 1305, 1313 (11th Cir. 2010). "[A]n adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Id.*

(quoting *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997). "Mere negligence" is insufficient. *Bashir*, 119 F.3d at 931.

Plaintiff states that "Maersk provided a twist lock from container [sic] stacked at the 'five-high' level for analysis and testing. Unfortunately, the evidence in this action indicates that the twist lock actually fell from the container that was stacked 'four high.' These facts alone raise a rebuttable presumption in favor of Appellants that the twist lock was defective." The district court could make little sense of Plaintiff's argument. "Plaintiffs appear to assume bad faith simply because the twist-lock provided by Defendant Maersk did not meet Plaintiffs' expectations." Plaintiff contends that the district court mistook the argument and restates it on appeal:

> Appellants have evidence that an incorrect twist lock was provided per the testimonies of those that witnessed the event. Additionally, Appellants provide evidence that some lubrication or other agent was added to the provided twist lock. The lubrication would be irrelevant if the twist lock provided by Appellee Maersk was a twist lock other than the one in dispute in this case. On the other hand, if this twist lock was, as Maersk contends, the twist lock relevant to this lawsuit, then it is clear that the lubricant or agent applied to the twist lock would prevent the twist lock from being presented in an unmodified condition.

Plaintiff, however, cites no evidence in support of his position that the twist-lock provided was not the one that struck him. Nor does Plaintiff explain why the

13

alleged lubrication means that the twist-lock was tampered with or is not the one involved in the accident.

The district court was well within its discretion in refusing Plaintiff's request for an adverse inference. First, Plaintiff has not provided evidence that should have led the district court to conclude that the twist-lock was either not the twist-lock that struck Plaintiff or that it had been modified after the accident. Second, even if the twist-lock was not the one that struck Plaintiff, Plaintiff has not met the burden of showing that there was bad faith, as opposed to mere negligence, in collecting and turning over the correct twist-lock. Plaintiff's unsupported speculations are insufficient to raise a genuine issue of material fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). We thus **AFFIRM** the district court's denial of an adverse inference on this issue.

Plaintiff argues that the district court erred in granting summary judgment in favor of Maersk because there was a genuine issue of material fact. However, Plaintiff's alleged genuine issue of material fact is the defective twist-lock. Plaintiff believes this remains a genuine issue of material fact because the district court erred in not granting the adverse inference Plaintiff requested. Plaintiff offers no further argument beyond that. Thus, having resolved the issue of the adverse inference, we find no error in the district court's grant of summary

14

judgment in favor of Maersk. We **AFFIRM** the grant of summary judgment in favor of Maersk.

## C. Exclusion of Williams' and Culwell's Testimony

We review a district court's ruling on evidentiary matters for abuse of discretion. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 556 (11th Cir. 1998).

The district court excluded the testimonies of Williams and Culwell because they failed to meet the standard required for expert testimony. Federal Rule of Evidence 702 governs the admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In applying Rule 702, the district courts consider whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert

reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific . . . expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). It is the burden of the party seeking to introduce the expert testimony to establish that the requirements have been met. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).

With regard to Williams, the district court held that Plaintiff failed to meet his burden. The district court found that Williams' "career repairing corner casing is wholly insufficient to render [him] qualified to offer an opinion as to whether a corner casing was defective and whether that defect caused the twist-lock to become dislodged." On appeal, Plaintiff argues that Williams' experience is more extensive than the district court recognized. Plaintiff mentions that Williams "re-built entire containers, including casting corners, during his career," and has held supervisory positions over other welders. In response, Moller argues that Williams "has no experience actually performing the job that Plaintiffs have hired him to opine about in this case: to wit, inspecting and assessing the condition of corner castings." Moller points out that Williams did not inspect corner castings; rather, marine surveyors did the inspecting, and Williams merely repaired the castings that those marine surveyors sent to him. Williams admitted in his deposition that he

16

could not say what amount of rust present on a corner casting would render it in need of repair or replacement, stating that a "[s]urveyor would have a figure for it," but "I wasn't a surveyor, I'm a mechanic. My job is to fix it." Moller further notes that in his sole inspection of the corner casting and the container, Williams only visually inspected the container without taking measurements or performing any tests. Finally, in his deposition, Williams conceded that he could not say that the rust on the corner casting caused the twist-lock to fail.

As for Culwell, the district court held that Plaintiff had "fail[ed] to identify any characteristic that would reasonably render Mr. Culwell's opinion reliable." This is because Culwell's expert report does not explain his methodology and "elucidates no standards for determining inappropriate amounts of wear for corner casings, nor is it based on any technique that has been subjected to peer review." Indeed, the district court stated that "Culwell did little more than look at pictures of the container and arrive at a personal belief that the corner casting may have contributed to the twist-lock becoming dislodged."

On appeal, Plaintiff argues that Culwell's engineering education and extensive experience in maritime equipment consulting qualify him as an expert. Further, Plaintiff asserts that in reaching his conclusion that the wear on the casting corner most likely caused the accident, Culwell followed Moller's own guidelines.

17

In response, Moller points out first that Culwell did not personally inspect the corner casting in reaching his opinion that it was too worn. More importantly, Moller notes that Culwell admits that there is no industry standard for the amount of wear a corner casting may safely endure and that he has no opinion on what that standard should be.

The district court did not err in rejecting the expert testimony of Williams or Culwell. By Williams' own statements, he has no expertise in identifying a defective corner casting. He meets none of the three requirements we set out in *Frazier*. There are no grounds for believing that Williams could testify competently about the state of the corner casting, that he employs a reliable methodology, or that he would help the trier of fact understand the evidence or determine a fact in issue. *See Frazier*, 387 F.3d at 1260. Although he presents a stronger case for expertise due to his education and experience, Culwell too was rightly rejected as an expert because he provided no reason to believe that his opinion was rendered on the basis of some standard or pursuant to some methodology. The district court had no way of determining the reliability of Culwell's opinion because of his failure to explain his methodology. *See United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013). Without such an explanation, Culwell's testimony would not help the trier of fact

18

in understanding the evidence or determining a fact in issue.  We thus **AFFIRM**

the district court's exclusion of the testimonies of Williams and Culwell.

## III.    CONCLUSION

We **AFFIRM** the district court on all points raised by Plaintiff's appeal.

The district court applied the correct legal standard to Plaintiff's claims.  It did not

err in excluding the testimony of Williams and Culwell.  It did not err in denying

Plaintiff's request for an adverse inference.  Finally, it did not err in granting

summary judgment to Moller and Maersk.